**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**GREENVILLE DIVISION**

| | |
|---|---|
| EDDIE JAMAAL MIXON, <br><br> Plaintiff, <br><br> v. <br><br> LEXISNEXIS RISK SOLUTIONS INC., <br><br> Defendant. | Civil Action No. 4:24-CV-123-DMB-JMV <br><br> Honorable Judge: <br><br> **COMPLAINT AND DEMAND FOR JURY TRIAL** |

Eddie Jamaal Mixon ("Plaintiff" or "Mr. Mixon") a living, breathing 40 year-old consumer, brings this action on an individual basis, against LexisNexis Risk Solutions Inc. ("Defendant" or "LexisNexis") for actual, statutory, and punitive damages and costs, and attorney's fees, for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et. seq.*

## INTRODUCTION

1.      The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2.      However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is

disseminated and/or obtained about them. In fact, Defendant acknowledges this potential for misuse and resulting damage every time it sells its respective services to a consumer.

3.      The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4.      Defendant LexisNexis Risk Solutions, Inc., together with non-parties Equifax Information Services LLC ("Equifax"), Experian Information Solutions, Inc ("Experian"), and Trans Union LLC ("Trans Union"), are four of the largest credit reporting bureaus in the United States.

5.      These CRAs sell information to readily paying subscribers (*i.e.*, retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, insurance, or a car or mortgage loan.

6.      Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

7.      "Credit is the lifeblood of the modern American economy, and for the American consumer access to credit has become inextricably tied to consumer credit scores as reported by credit reporting agencies." *Burke v. Experian Info. Sols., Inc.*, 2011 WL 1085874, at *1 (E.D. Va. Mar. 18, 2011). "A credit report can determine everything from whether a person can secure a credit card, purchase a home, win a new job, or start a small business." *Dep't of Agric. Rural Dev.*

*Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 45 (2024).

8.     Congress made the following findings when it enacted the FCRA in 1970:

(a)     The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

(b)     An elaborate mechanism has been developed for investigating and evaluating the credit worthiness, credit standing, credit capacity, character, and general reputation of consumers.

(c)     Consumer reporting agencies have assumed a vital role in assembling and evaluating consumer credit and other information on consumers.

(d)     There is a need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy.

15 U.S.C. § 1681(a)(1-4).

9.     Thus, one of the fundamental purposes of the FCRA is "to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information in accordance with the requirements of this subchapter." 15 U.S.C. § 1681(b). Accordingly, "[t]he FCRA evinces Congress' intent that consumer reporting agencies, having the opportunity to reap profits through the collection and dissemination of credit information, bear 'grave responsibilities.'" *Cushman v. Trans Union*, 115 F.3d 220, 225 (3d Cir. 1997).

10.     The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

[W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to

3

> impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally **ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home**. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 cong. Rec. 36570 (1970)] (emphasis added).

11.     Since 1970, when Congress enacted the Fair Credit Reporting Act, as amended, 15 U.S.C. § 1681 et. seq., ("FCRA"), the federal law has required CRAs to have in place and to utilize reasonable procedures "to assure the maximum possible accuracy" of the personal and financial information that they compile and sell about individual consumers.

12.     The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

13.     In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U. S. C. § 1681(a)(4).

14.     The FCRA also requires furnishers of information, a creditor or other third party that provides information about consumer to a CRA, upon notice, to conduct a reasonable reinvestigation of all disputes with regard to the completeness or accuracy of any information it

4

provides to the CRAs regarding a consumer and modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

15.     Plaintiff brings claims against Defendant for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b).

16.     As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from the Defendant for its willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.*, as described herein.

## PARTIES

17.     Eddie Jamaal Mixon ("Plaintiff" or "Mr. Mixon") is a natural person residing in Greenwood, Mississippi, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

18.     Defendant LexisNexis Risk Solutions, Inc. ("Defendant" or "LexisNexis") is a Delaware corporation doing business throughout the United States, including the State of Mississippi and in this District, and has a principal place of business located at 1000 Alderman Drive, Alpharetta, Georgia 30005. LexisNexis can be served at its registered agent, C T Corporation System, located at 645 Lakeland East Drive, Suite 101, Flowood, Mississippi 39232.

19.     LexisNexis is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). LexisNexis is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and

15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

21.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## FACTS

### Summary of the Fair Credit Reporting Act

22.     The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

23.     The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. § 1681(a).

24.     Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information. *See* 15 U.S.C. § 1681(b).

25.     To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C.

§ 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

26.     The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with their statutory obligations under the FCRA.

### The "Mixed File" Problem

27.     A recurring and known issue within the credit reporting industry is the creation of "mixed files."

28.     A "mixed file" occurs when personal and credit information belonging to Consumer B appears in one or more of Consumer A's credit files.

29.     The Federal Trade Commission defined a mixed credit file as a file that "refers to a Consumer Report in which some or all of the information pertains to Persons other than the Person who is subject to that Consumer Report." *F.T.C. v. TRW, Inc.*, 784 F. Supp. 361, 362 (N.D. Tex. 1991).

30.      "Mixed files" create a false description and representation of a consumer's credit history and result in the consumer not obtaining credit or other benefits of our economy.

31.     Defendant's procedures for matching consumer information to a consumer report often cause the mixing of one consumer with another.

32.     Another consequence of mixed files is the resulting disclosure of a consumer's most personal identifying and financial information absent the consumer's knowledge or consent, or both. This occurs when a consumer's file is mixed with that of another consumer, and either of those consumers applies for credit, housing, insurance, or employment, and Defendant sells information pertaining to one consumer in response to the application of the other. This violates

the consumer's privacy and also greatly increases their risk of identity theft.

**The "Mixed File" Problem is Known to Defendant LexisNexis**

33.    Mixed files are not a new phenomenon. CRAs like Defendant LexisNexis have been on notice of the existence of mixed files.

34.    In particular, CRAs have been on notice of the fact that procedures for creating credit files, including matching algorithms, are prone to frequently cause mixed files, for over thirty (30) years. *See Thompson v. San Antonia Retail Merchants Ass'n*, 682 F.2d 509, 511 (5th Cir. 1982).

35.    CRAs like Defendant LexisNexis mix files even though every consumer has unique personal identifying information, such as a Social Security number. That is so because their systems allow information to be included in a consumer's file even when the Social Security number reported with the information is different from the Social Security number on the consumer's file.

36.    Defendant knows that its matching procedures are causing inaccurate consumer reports, consumer disclosures, and mixed files.

37.    In the 1990's, the Federal Trade Commission ("FTC") sued multiple national CRAs because of their failure to comply with the FCRA including the mixing of consumers' files.

38.    In the 1990's, the Attorneys General of numerous states sued multiple national CRAs because of their failure to comply with the FCRA including the mixing of consumers' files.

39.    In 1991, non-party TRW, a predecessor of non-party Experian, signed a Consent Order with the FTC. To prevent the occurrence or reoccurrence of a mixed file, TRW agreed to use, for matching and identification purposes, a consumer's full identifying information, defined as full first and last name, full street address, zip code, birth year, any generational designation and

social security number.

40.     In 1992, non-party Trans Union signed a Consent Order with the Attorneys General of 17 states. Non-Party Trans Union agreed that it would maintain reasonable procedures to prevent the occurrence or reoccurrence of mixed files. For example, procedures during the reinvestigation process include, assigning mixed file cases to Senior Investigators who, as appropriate, must pull all files related to the consumer, fully verify disputed information, make any changes, deletions or additions to correct the file and resolve the dispute, and prepare a summary of the problem to be filed with another department for corrective action.

41.     In 1992, non-party Equifax signed an Agreement of Assurances with the State Attorneys General and agreed to take specific steps to prevent the occurrence of mixed files and to adopt procedures designed specifically to reinvestigate consumer disputes resulting from mixed files.

42.     In 1995, non-party Equifax signed a Consent Order with the FTC. Non-party Equifax agreed it would follow reasonable procedures to assure the maximum possible accuracy of the information on a consumer's file including, but not limited to, procedures to detect logical errors prior to reporting information on a consumer's file, procedures to prevent mixing as a result of data entry by third parties when the third party requests a consumer's report, and procedures during a reinvestigation specifically designed to resolve consumer disputes related to a mixed file.

43.     To prevent the occurrence of a mixed file, national credit bureaus like non-parties Experian, Equifax and Trans Union entered into agreements not to place information in a consumer's file (other than certain public record information) unless it has identified such information by at least two of the following identifiers: (i) the Consumer's name; (ii) the Consumer's Social Security number; (iii) the Consumer's date of birth, or (iv) the Consumer's

account number with a Subscriber or a similar identifier unique to the Consumer.

44.     Defendant LexisNexis, along with other CRAs, continue to repeatedly mix consumers' files despite the CRA agreements with the FTC and State Attorneys General and hundreds of lawsuits filed against them by consumers whose files have been mixed.

45.     When those lawsuits have gone to trial, juries have found consumer reporting agencies, willfully violated the accuracy and reinvestigation requirements of the FCRA - §§ 1681e(b) and 1681i – and awarded punitive damages as high as $18 million. Yet the "mixed file" problem continues.

46.     For example, in 2015, the New York Attorney General filed charges and settled claims with non-parties Equifax, Experian and Trans Union over mixed files.[1] *See In the Matter of Eric T. Schneiderman, Attorney General of the State of New York v. Experian Information Solutions, Inc.; Equifax Information Services, LLC; and Trans Union LLC.*

47.     Non-party Equifax's matching logic mixed two consumers' files when only seven out of the nine digits of the two consumers' Social Security numbers matched. *Apodaca v. Discover Fin. Servs.*, 417 F. Supp. 2d 1220, 1224 (D.N.M. 2006).

48.     In 2002, the jury in *Judy Thomas v. Trans Union LLC*, District of Oregon, Case NO. 00-1150-JE, found Trans Union had willfully violated the FCRA by mixing Judy Thomas's personal and credit information with another consumer's and failing to unmix them despite Ms. Thomas' numerous disputes. The jury awarded Ms. Thomas $300,000.00 in actual damages and $5,000,000.00 in punitive damages.

---

[1] https://superiortradelines.com/wp-content/uploads/2015/05/Press-Release.pdf (last visited Nov. 6, 2024); *see also* https://ag-ny.gov/pdfs/CRA%20Agreement%20Fully%20Executed%203.8.15.pdf Last visited May 17, 2022.

49.     In 2007, the jury in *Angela Williams v. Equifax Information Services, LLC*, Circuit Court for Orange County Florida, Case No. 48-2003-CA-9035-0, awarded Angela Williams $219,000.00 in actual damages and $2,700,000.00 in punitive damages for willfully violating the FCRA by mixing Angela Williams with another consumer and failing to unmix them despite Ms. Williams' disputes.

50.     Despite these verdicts and the ample notice available to Defendant, Defendant continues to mix consumers' credit files with other consumers' credit files.

51.     In 2013, the jury in *Julie Miller v. Equifax Information Services, LLC*, District of Oregon, Case No. 3:11-cv-01231-BR, awarded Julie Miller $180,000.00 in actual damages and more than $18,000,000.00 in punitive damages for willfully violating the FCRA by mixing Julie Miller with another consumer and failing to unmix them despite Ms. Miller' numerous disputes.

52.     A jury assessed a $60 million dollar verdict against Trans Union for mixing innocent persons as terrorists and drug dealers by matching consumers with the Office of Foreign Asset Control's "terrorist alert" list based on first and last name alone. *See Ramirez v. Trans Union, LLC*, No. 12-CV-00632-JSC, 2017 WL 5153280, at *1 (N.D. Cal. Nov. 7, 2017), *aff'd in part, vacated in part, rev'd in part sub nom. Ramirez v. TransUnion, LLC*, 951 F.3d 1008 (9th Cir. 2020).

53.     Despite these verdicts against consumer reporting agencies like Defendant, Defendant continues to mix consumers' credit files with other consumers' credit files.

54.     Defendant has been sued hundreds of times wherein an allegation was made that Defendant violated the FCRA, and many of those lawsuits have been on account of an alleged mixed-file on the part of Defendant.

55.     FCRA lawsuits have resulted in multi-million-dollar verdicts for consumers who

fall victim to a mixed credit file.

56.     "Evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong evidence is required to cure the defendant's disrespect for the law." *Dalton v. CAI*, 257 F.3d 409, 418 (4th Cir. 2001) (noting that whether "other consumers have lodged complaints similar to Dalton's against CAI" is relevant to willfulness under the FCRA). Moreover, repeated noncompliance with statutory duties can establish that the defendants acted willfully. *See Safeco Ins. Co. of Am. v. Bur*r, 551 U.S. 47, 53 (2007) (punitive damages can be awarded based on "reckless disregard for a statutory duty").

57.     No less than three federal Courts of Appeal have held a consumer reporting agency violates 15 U.S.C. § 1681e(b) and may be found to have willfully violated the FCRA when it mixes a consumer's file with another consumer.

58.     Notably, the Federal Trade Commission has specifically warned consumer reporting agencies to review their procedures when a mixed file occurs.

59.     Despite federal and state law, Congressional mandate, federal and state enforcement actions, and thousands of consumer lawsuits, mixed credit files remain a significant problem for innocent consumers, including Plaintiff.

**Defendant's Practices Concerning the Sale of Reports on the "Deceased"**

60.     Defendant sells millions of consumer reports (often called "credit reports" or "reports") per day.

61.     Pursuant to 15 U.S.C. § 1681e(b), consumer reporting agencies, like Defendant, are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

62.     Pursuant to 15 U.S.C. §§ 1681b and 1681e(a), consumer reporting agencies, like Defendant, must maintain reasonable procedures to assure that consumer reports are sold only for legitimate "permissible purposes."

63.     Defendant routinely places a "deceased" notation or marking on reports when it is advised by any of its many data sources that a given consumer is deceased.

64.     Defendant does not request or require a death certificate from any of its data sources which advise that a consumer is "deceased" before placing a "deceased" mark in that consumer's credit file.

65.     Defendant does not request or require any proof from any data source which advises that a consumer is "deceased," showing that the consumer is in fact deceased before placing a "deceased" mark on that consumer's report.

66.     Defendant does not independently verify with any source that a consumer is in fact deceased before placing a "deceased" mark on that consumer's report.

67.     In some cases, in order to assure accuracy, Defendant may send letters and/or other communications to consumers when certain information that may be considered suspicious or unreliable is furnished about said consumers to be placed in their credit files, such as in cases where consumers have a freeze or fraud alert on their credit report, or in accordance with certain state laws, such as the consumer laws of Colorado. Defendant does not have any procedure to notify consumers (such as a next of kin or executor or administrator of the consumer's estate) when Defendant has received information suggesting the consumer is deceased before adding that information to the consumer's credit file or report.

68.     The Social Security Administration (SSA) maintains the **Death Master File** ("**DMF**"). The DMF is also known commercially as the Social Security Death Index (SSDI). The

13

SSA's DMF as of 2018 contained information on 111 million deaths that have been reported to the SSA. The DMF is created from internal SSA records of deceased persons possessing social security numbers and whose deaths were reported to the SSA. The DMF includes the following information on each decedent, if the data are available to the SSA: social security number, name, date of birth, and date of death.

69. Legislation (*i.e.*, the Social Security Act) precludes the sharing of the full DMF with non-benefits paying agencies.

70. Because of the wide use and demand for death records for a variety of industries, SSA has partnered with the U.S. Department of Commerce's National Technical Information Service (NTIS) to release the **Limited Access Death Master File** ("**LADMF**") electronically on a weekly and monthly basis.

71. The SSA receives death reports from many sources, including family members, funeral homes, financial institutions, postal authorities, state information, and other federal agencies. The SSA does not have a death record for all persons; therefore, the SSA does not guarantee the veracity of the DMF. The SSA does not guarantee 100% of the data.

72. The SSA estimates that roughly 12,000 living people are added to the DMF annually, potentially due to clerical error. An erroneous listing can lead to not only a cessation of government benefits, but also the freezing of bank accounts, the inability to buy or rent property, and mistaken accusations of identity theft.[2]

73. The Office of the Inspector General called the error rate "very low," but noted that

---

[2] *Aviva Dekornfeld (2018-06-20).* "The Plight of the Living Dead". *The Indicator from Planet Money (Podcast); see also* Bichell, Rae Ellen (2016-08-10). "Social Security Data Errors Can Turn People into the Living Dead". *National Public Radio.*

"SSA's erroneous death entries can lead to mistaken benefit terminations and cause severe financial hardship and distress to affected people…when errors like this occur, it can be a long and difficult process to resurrect your financial health.[3]

74. Defendant does not have access to the full DMF from the SSA, but rather is a subscriber to the NTIS LADMF.

75. Despite being a subscriber to the NTIS LADMF, Defendant does not cross-reference the information it has received suggesting a consumer is deceased with the LADMF in order to determine whether any given consumer reported as deceased via its source is also on the LADMF before selling a credit report about said consumer, or at any time.

76. Defendant fails to employ reasonable procedures that assure that a consumer is actually deceased before placing the "deceased" mark on that consumer's report and selling that report for profit.

77. Even in instances where other data on the face of the consumer's report indicates that he/she is not deceased, Defendant does not employ any procedures to assure that a consumer is in fact actually deceased before placing the "deceased" mark in that consumer's file.

78. Even in instances where the purportedly deceased consumer communicates directly with the Defendant, Defendant does not employ any procedures to assure that a consumer is in fact actually deceased before placing the "deceased" mark on that consumer's report.

79. Defendant knows that living consumers are routinely turned down for credit specifically because they are reporting them as "deceased."

80. Defendant has been put on notice for years through consumer disputes and lawsuits

---

[3] "Cases of Mistaken Death Reports Low but Costly | Office of the Inspector General, SSA". *oig.ssa.gov*. 2016-03-24. Archived from the original on 2020-07-16.

that living, breathing consumers are turned down for credit specifically because Defendant is inaccurately reporting them as "deceased."

81.     Defendant has received and documented many disputes from consumers complaining that Defendant had erroneously marked them as "deceased" on their credit reports.

82.     Defendant knows that thousands of consumers are erroneously marked as "deceased" on their credit reports.

83.     Nevertheless, Defendant does not employ any procedures to assure that a consumer is actually deceased before adding a "deceased" notation to that consumer's credit reports.

84.     Defendant does not employ any procedures to limit or stop the furnishing of reports to third parties for consumers that they have marked as "deceased" under any circumstances.

85.     For years after a consumer's actual death, Defendant will continue to sell credit reports about that consumer.

86.     Defendant will only remove a deceased consumer's file from its respective credit reporting databases when it is no longer valuable to them—meaning that no one is continuing to purchase reports about that consumer.

87.     Defendant charges third parties a fee for reports with a mark that a consumer is deceased ("reports on the deceased") as they would for any other report.

88.     Defendant profits from the sale of reports on deceased consumers.

89.     Defendant knows that truly deceased consumers do not apply for credit.

90.     Defendant knows that the credit information and reports of truly deceased persons are used by criminals to commit identity theft or credit fraud. Indeed, identity theft using the personal identifying information of deceased consumers is known to Defendant to be a common and major source of identity theft.

16

91.     Defendant knows that identity theft and credit fraud are serious and widespread problems in our society.

92.     Defendant sells reports on supposedly deceased consumers to third parties in an automated fashion and without any specific or general certification that could reasonably explain a "permissible purpose" for purchasing or using a (supposedly) deceased consumer's credit history and/or report.

93.     For consumers who are deceased, there rarely, if ever, exists a permissible purpose under the FCRA for the Defendant to sell their credit reports, absent a court order.

94.     Defendant knows that such reports contain a vast amount of personal identifying and credit account information on the supposedly deceased consumer, information that can be used to commit identity theft or for other fraudulent purposes.

### Plaintiff Receives Notice of Deceased Reporting

95.     In or about August 2024, Plaintiff set out to establish a more robust credit history, recognizing the value of an established and good credit history. Plaintiff is a single father of two young children and the only reliable source of income and support for his family. Plaintiff was looking for opportunities to improve his credit so that he would be able to qualify for a loan to renovate their home.

96.     In or around August 2024, Plaintiff accepted an offer from Netspend to open a debit account. Plaintiff had received offer letters from Netspend in the past, but now Plaintiff thought opening this account was a good step to establish his creditworthiness.

97.     After Plaintiff provided his personal information, Plaintiff's application was not immediately approved.

98.     Shortly  thereafter,  Plaintiff  called  Netspend.  A  representative  of  Netspend

requested information and additional documentation to verify Plaintiff's identity. Netspend explained that it was unable to approve his application because he was reported as deceased.

99.     Certainly, Plaintiff was not deceased. Plaintiff found that information to be very distressing and confusing, even shocking.

100.    Plaintiff informed the Netspend representative that he was not deceased. The Netspend representative was unable to approve Plaintiff's application at that time, however, Plaintiff could submit documents to Netspend online.

101.    On or around August 29, 2024, Plaintiff called the SSA. The SSA agent confirmed that the SSA was not being reported as deceased.

102.    Plaintiff was disappointed at the denial, but Plaintiff assumed it was just some sort of fluke and endeavored to continue to seek opportunities for credit.

### Plaintiff Applied for a Capital One Credit Card in September 2024

103.    In or about September 2024, Plaintiff was still set out to establish a more robust credit history, recognizing the value of an established and good credit history.

104.    Plaintiff reviewed varying credit card promotions and wanted to wait for the right card for him.

105.    Accordingly, in or about September 11, 2024, Plaintiff completed and submitted an application with Capital One for a credit card.

### Capital One Denies Plaintiff's Credit Card Application in September 2024

106.    Capital One ordered a consumer report about Plaintiff from Defendant on or about September 11, 2024.

107.    Defendant published information about Plaintiff to Capital One in response to that credit application on or about September 11, 2024.

108.    Upon receipt and review of Defendant's report about Plaintiff, Capital One denied Plaintiff's credit card application. Specifically, Capital One denied Plaintiff's credit card application because Defendant reported that Plaintiff was deceased.

109.    Upon information and belief, Capital One denied Plaintiff's credit card application based upon the contents of a consumer report Defendant sold about Plaintiff.

110.    Plaintiff was disappointed at the Capital One credit card denial. Certainly, Plaintiff was not deceased. Plaintiff found that information to be very distressing and confusing, even shocking.

111.    Plaintiff was embarrassed to learn that Defendant had reported that Plaintiff was deceased. Certainly, Plaintiff was not deceased. Plaintiff was very distressed at the continued reporting of information suggesting he was deceased. Plaintiff was frustrated at the credit denial because he very much needed the credit for his family. Plaintiff felt that the recipients of that information no doubt questioned his motives and integrity and worst yet possibly suspected him of identity theft as they could clearly discern that he was not deceased.

112.    Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

**Plaintiff Applied for Insurance with Allstate Insurance in September 2024**

113.    In or about September 2024, Plaintiff needed to obtain car insurance.

114.    Plaintiff reviewed varying insurance offers and policies and wanted to get the best rate and coverage for him and his family.

115.    For Allstate Insurance to evaluate Plaintiff's creditworthiness, it would need to obtain copies of his consumer files. Plaintiff provided Allstate Insurance with his personal

identification information, including his Social Security number, and authorized it to obtain copies of his consumer files.

116.     Accordingly, in or about September 11, 2024, Plaintiff completed and submitted an application with Allstate Insurance.

**Allstate Insurance Denies Plaintiff's Application in September 2024**

117.     Allstate Insurance ordered a consumer report about Plaintiff from Defendant on or about September 11, 2024.

118.     Defendant published information about Plaintiff to Allstate Insurance in response to that insurance application on or about September 11, 2024.

119.     Upon information and belief, Allstate quoted Plaintiff an extremely high amount for insurance based upon inaccuracies in a consumer report published by Defendant.

**Plaintiff Applied for Insurance with Hugo Car Insurance in September 2024**

120.     After receiving  Allstate Insurance's very expensive quotation, Plaintiff decided to seek car insurance elsewhere.

121.     Plaintiff again reviewed varying insurance promotions and wanted to find the right insurance for him and his family.

122.     Plaintiff decided he would submit an application for insurance with Hugo Car Insurance ("Hugo"). For Hugo to evaluate Plaintiff's creditworthiness, it would need to obtain copies of his consumer files. Plaintiff provided Hugo with his personal identification information, including his Social Security number, and authorized it to obtain copies of his consumer files.

123.     Accordingly, in or about September 2024, Plaintiff completed and submitted an application with Hugo Car Insurance for auto insurance.

**LexisNexis Reports Plaintiff as Deceased to Hugo Car Insurance in September 2024**

124.     Hugo Car Insurance ordered a consumer report about Plaintiff from Defendant on or about September 24, 2024.

125.     Defendant published information about Plaintiff to Hugo Car Insurance in response to that auto insurance application on or about September 28, 2024.

126.     Within Defendant's report about Plaintiff, LexisNexis once again reported Plaintiff as deceased. Despite LexisNexis reporting Plaintiff as deceased, Plaintiff was fortunately able to obtain insurance through Hugo Car Insurance.

127.     Upon information and belief, although Plaintiff's insurance application was approved, Plaintiff was approved at less than favorable rates.

128.     Despite the approval, Plaintiff was embarrassed and frustrated to learn that Defendant had once again reported that Plaintiff was deceased. Certainly, Plaintiff was not deceased. Plaintiff was very distressed at the continued furthering of information suggesting he was deceased. Plaintiff once again felt that the recipients of that information no doubt questioned his motives and integrity and worst yet possibly suspected him of identity theft as they could clearly discern that he was not deceased.

### Plaintiff Obtains His Consumer Report and Confirms that Defendant Was Reporting Him as Deceased and Mixed with Another Consumer

129.     Although Plaintiff was finally able to obtain insurance, he was deeply concerned that some CRA was reporting Plaintiff as deceased.

130.     Concerned about the impact of this continued reporting, on October 19, 2024, Plaintiff obtained and reviewed his LexisNexis consumer report.

131.     Upon reviewing the contents of Defendant's consumer report, Plaintiff was shocked at the appearance of several pieces of information that did not belong to Plaintiff at all.

132.     The information Defendant LexisNexis about Plaintiff in Plaintiff's consumer

report included numerous records and identification information that did not belong to Plaintiff. Rather, those records and identification information belonged to two different consumers: Plaintiff's father Eddie M. Mixon and a wholly unrelated consumer named Eddie Johnson.

133.   For instance, in the "Identification Records" section Defendant LexisNexis reported Plaintiff as deceased by indicating in the "Date of death" field the date – 05/19/2006. This is the date his father passed away.

134.   Defendant had every reason to know that Plaintiff did not die in May 2006 based upon the many credit and insurance applications submitted by Plaintiff, the many credit accounts opened and insurance policies taken out, and the many payments made since then.

135.   Defendant LexisNexis further reported information belonging to his father in Plaintiff's consumer file, specifically, Plaintiff's father's name, date of birth, date of death, and employment records.

136.   Upon closer review, Plaintiff discovered that Defendant was reporting several pieces of personal identifying information, insurance claims, and driving records that **did not** belong to him as follows:

A.   Names:
- Eddie Johnson
- Eddie M Mixon
- Mixon Mixon
- Eddie M. Mixon
- M

B.   Dates of Birth:
- 12/29/1985
- 12/01/9999
- 0
- 11/25/1949
- 11/01/1949

C.   A date of death of 05/19/2006

    D.       Addresses:
- 1139 Marshall St, Greenville, MS 38701-6227
- 2101 Hayes Rd 311 Apt, Houston, TX 77077-6927
- 8496 Dairy View Ln, Houston, TX 77072-3976
- 3325 Lariat Ln, Garland, TX 75042-5415
- 423 W Ohea St, Greenville, MS 38701-3638
- 2411 E Alexander St, Greenville, MS 38703-3318
- 864 Ashburn Rd, Greenville, MS 38703-6004
- 1016 Goethal St, Greenville, MS 38701-5614
- 80 E 101st St, Chicago, IL 60628-2006
- 2101 Hayes Rd 311, Houston, TX 77077-6927
- 345 S Theobald St 38701-4174

    E.       A business association with the Mississippi Forestry Commission

    F.       Phone Numbers:
- 317-546-7339
- 773-568-5157

    G.       One email address:
- ouintdee03yahoo.com

    H.       An insurance policy belonging to Eddie Johnson with Commonwealth Casualty

    I.       An automobile insurance claim:
Name of Claimant: Eddie Johnson
Driver's License No.: XXXXX5489
Date of Claim: September 11, 2023
Claim Amount: $470

    J.       Driver's license records from states Plaintiff never lived:
- Ohio
- Pennsylvania
- Virginia
- Louisiana

137.   Plaintiff discovered that LexisNexis mixed Plaintiff's consumer file with the consumer information of a wholly unrelated consumer named Eddie Johnson ("Johnson") despite the fact that Plaintiff has a different middle name, last name, birthday and year, driver's license number, and Social Security Number.

23

138.     Defendant LexisNexis mixed Plaintiff's file with Johnson's consumer information despite the fact that Plaintiff has a different address history from Johnson.

139.     Defendant LexisNexis mixed Plaintiff's file with Johnson's consumer information despite the fact that Plaintiff's name is Eddie Jamaal Mixon and Johnson's full name as reported in Plaintiff's LexisNexis report is Eddie Johnson (no middle name).

140.     Defendant LexisNexis mixed Plaintiff's file with Johnson's consumer information despite the fact that Plaintiff and Johnson have different Social Security Numbers.

141.     Defendant LexisNexis falsely attributed at least one automobile insurance claim to Plaintiff.

142.     Defendant LexisNexis published at least one consumer report to Capital One, Allstate, and Hugo Insurance in response to Plaintiff's credit and insurance applications.

143.     Defendant LexisNexis took no steps whatsoever to review, analyze, or audit the information in Plaintiff's consumer file prior to selling it.

144.     Prior to selling the consumer reports about Plaintiff, Defendant LexisNexis did nothing to reconcile the inconsistent information on the face of the consumer report.

145.     Had Defendant LexisNexis taken any steps to investigate whether the information in Plaintiff's consumer report belonged to Plaintiff before reporting the same to Plaintiff's potential lenders and insurers, it would have easily verified that the information it attributed to Plaintiff actually belonged to Plaintiff's father Eddie M. Mixon and a wholly unrelated consumer named Eddie Johnson.

146.     Plaintiff reasonably believes that the denials were a direct result of Defendant LexisNexis reporting Plaintiff as deceased. Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the consumer

information it published and maintained concerning Plaintiff.

147.    As a result of the deceased notation, Defendant made it practically impossible for Plaintiff to continue to obtain credit and insurance.

148.    Due to Defendant's inaccurate reporting on at least one occasion, Plaintiff could not even renew his auto insurance.

149.    Plaintiff's inability to purchase auto insurance, and his therefore being bereft of auto insurance, caused a significant amount of stress to Plaintiff, particular because he has two young children. He needed to drive, and was reasonably, terribly concerned about the potential of being involved in an accident while not maintaining insurance.

150.    At the end of September 2024, Plaintiff determined that he would purchase auto insurance from whatever insurance would accept his application at the steeply and artificially and inaccurately increased rate.

151.    At all times pertinent hereto, Defendant was acting by and through its agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendant herein.

152.    At all times pertinent hereto, the conduct of Defendant, as well as that of its respective agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

153.    Defendant is aware of the shortcomings of its procedures and intentionally chooses not to comply with the FCRA to lower its costs. Accordingly, the Defendant's violations of the FCRA are willful.

154.    As a result of Defendant's conduct, action, and inaction, Plaintiff suffered damages including but not limited to increased insurance premium costs; expenditure of time and labor

trying to correct the information reported by Defendant; loss of credit; loss of ability to purchase and benefit from his credit rating; detriment to his credit rating; loss of sleep, and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit and insurance denials, embarrassment of automotive records reporting about him, and having at least one other consumer's personal identifying information and automotive information, mixed into Plaintiff's consumer file.

<u>**CLAIMS FOR RELIEF**</u>
**COUNT I**
**15 U.S.C. § 1681e(b)**
**Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy**

155.    Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

156.    The FCRA imposes a duty on consumer reporting agencies to devise and implement procedures to ensure the "maximum possible accuracy" of consumer reports, as follows: "Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure **maximum possible accuracy** of the information concerning the individual about whom the report relates." 15 U.S.C. §1681e(b) (emphasis added).

157.    On numerous occasions, Defendant prepared patently false consumer reports concerning Plaintiff.

158.    Despite actual and implied knowledge that Plaintiff is not dead, Defendant readily sold such false reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately Plaintiff's creditworthiness.

159.    Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the consumer reports it published and maintained concerning Plaintiff.

160. As a result of Defendant's conduct, action, and inaction, Plaintiff suffered damages including but not limited to increased insurance premium costs; expenditure of time and labor trying to correct the information reported by Defendant; loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; loss of sleep, and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit and insurance denials, embarrassment of automotive records reporting about him, and having at least one other consumer's personal identifying information and automotive information, mixed into Plaintiff's consumer file.

161. Defendant's conduct, actions, and inactions was willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, Defendant was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

162. Plaintiff is entitled to recover attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

i.    Determining that Defendant negligently and/or willfully violated the FCRA;

ii.   Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

iii.  Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and,

iv.   Granting further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

Dated: December 17, 2024

*/s/ Brian H. Herrington*
Brian Kelly Herrington
CHABRA GIBBS & HERRINGTON, PLLC
120 North Congress Street, Suite 200
Jackson, MS 39201
T: (601) 326-0820
F: (601) 948-8010
E: bherrington@nationalclasslawyers.com

*Attorneys for Plaintiff,*
*Eddie Jamaal Mixon*